UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Thomas Catanzaro,

                Plaintiff,

                                              **Hon. Hugh B. Scott**

                v.                                     08CV389A

                                                 **Report
                                                 and
                                                 Recommendation**

COMMISSIONER OF SOCIAL
SECURITY[1],

                Defendant.

Before the Court are the parties' respective motions for judgment on the pleadings (Docket Nos. 9 and 10).

## **INTRODUCTION**

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security that plaintiff is not disabled and, therefore, is not entitled to disability insurance benefits and/or Supplemental Security Income benefits.

## **PROCEDURAL BACKGROUND**

The plaintiff, Thomas Catanzaro ("Catanzaro" or "plaintiff"), filed an application for disability insurance benefits on October 5, 2004. That application was denied initially and on

---

[1]For convenience, defendant will be identified by the official title only. See Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g) (action survives despite change in office of Commissioner).

reconsideration. The plaintiff appeared before an Administrative Law Judge ("ALJ"), who considered the case *de novo* and concluded, in a written decision dated November 2, 2007, that the plaintiff was not disabled within the meaning of the Social Security Act. The ALJ's decision became the final decision of the Commissioner on April 29, 2008, when the Appeals Council denied plaintiff's request for review.

Plaintiff subsequently commenced this action (Docket No. 1). The parties moved for judgment on the pleadings.

## **FACTUAL BACKGROUND**[2]

Catanzaro alleges that he has been disabled since February 1, 2003 due to depression and asthma. (R. 70). He was born in April of 1967 and graduated from high school. His prior work experience is that of a counter person in a tanning salon and a musician. (R. 86, 370).

On April 22, 2004, Catanzaro was seen at Erie County Medical Center ("ECMC") for treatment relating to asthma and depression (R. 180). He complained that he had difficulty trying to get visitation with his daughter; that he had difficulty sleeping and was gaining weight. (R. 181). Dr. Barbara Majeroni, who examined plaintiff, noted that he had a normal complete physical examination ("PE") (R. 182). She gave him a prescription from Lexapro for his depression, and recommended that he stop smoking (R. 182). The plaintiff follow-up with Dr. Majeroni (R. 172-76). He was seen on June 5, 2004, at that time Dr. Majeroni noted that plaintiff had some improvement in his depression, and that his affect was brighter since the last

---

[2] References noted as "(R.__)" are to the certified record of the administrative proceedings.

visit, because Catanzaro was dissatisfied with Lexapro, Dr. Majeroni switched his medication to Celexa (R. 177). On August 3, 2004, Catanzaro stated that he did not know if the Celexa was working, that he was experiencing increased sweating, and that he is not sleeping well. (R. 174). During a December 6, 2004 appointment with Dr. Majeroni, the plaintiff reported that Celexa was helping, but that he was experiencing side effects, including a reduced libido and difficulty getting an erection (R. 172).

On December 21, 2004, Dr. Thomas Ryan, a psychiatrist, examined the plaintiff at the Commissioner's request (R. 197). Catanzaro complained of depression, difficulty sleeping, and weight gain (R. 198). He stated that he had not had psychiatric counseling or hospitalizations in the past (R. 197). The plaintiff told Dr. Ryan that he could bathe, dress, and groom himself (R. 199). He stated that his mother did the household chores, but admitted that he could do them. He reported that he managed his own money and saw friends on occasion (R. 199). On examination, Dr. Ryan found that plaintiff's speech was fluent, his language was adequate, and his thought process was coherent and goal-directed (R. 198). Dr. Ryan found no evidence of hallucinations, delusions, or paranoia. Plaintiff's affect was appropriate; his mood was neutral; his sensorium was clear; and his attention, concentration and memory were intact (R. 198-99). Dr. Ryan opined that plaintiff could follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, and may perform some complex tasks independently (R. 199). He opined that plaintiff was capable of maintaining a regular schedule, learning new tasks, making adequate decisions, and relating with others. Dr. Ryan also reported that plaintiff may have difficulty dealing with stress, and explained that although plaintiff had stress-related

3

problems, these did "not appear to be significant enough to interfere with his ability to function on a daily basis" (R. 199).

Catanzaro was also examined by Dr. Christine Holland on December 21, 2004, at the Commissioner's request (R. 185-88). The plaintiff complained of asthma, but stated that he was not on any maintenance medication (R. 185). He used an inhaler every two weeks (R. 185). Plaintiff also complained that he has had back pain since 1989 (R. 185). He reported that he had not had a magnetic resonance imaging scan, and was not getting active treatment for his back complaints (R. 185). On examination, Dr. Holland observed that the plaintiff appeared to be in no acute distress (R. 186). His gait and stance were normal, and his squat was full. A musculoskeletal examination revealed full range of motion of the spine (R. 187). Strength was graded full, at 5/5. A neurologic review revealed no motor or sensory deficit (R. 187). A review of plaintiff's lungs revealed clear auscultation and normal percussion (R. 186). A pulmonary function test showed moderately severe obstruction (R. 187). The doctor noted that after using a bronchodilator, plaintiff showed a significant improvement (R. 187). Dr. Holland diagnosed that the plaintiff suffered from moderately severe asthma (R. 187). She opined that the plaintiff should have his asthma care adjusted and avoid his triggers (R. 187). She also diagnosed low back pain, and although she noted that his examination on that date was normal, she opined that Catanzaro had mild limitations in heavy lifting and twisting, due to his back complaints (R. 187-188).

The record includes a report dated February 1, 2005 from Dr. Hillary Tzetzo, a state agency psychiatrist, who reviewed the medical evidence regarding plaintiff's mental impairment, but did not examine Catanzaro (R. 208-25). Dr. Tzetzo opined that the plaintiff had a mild

4

restriction in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of deterioration, each of extended duration (R. 218). Dr. Tzetzo opined that plaintiff could engage in work-related tasks in a low-contact environment (R. 224).

On March 14, 2005, Dr. Majeroni reported that the plaintiff's libido improved after he stopped taking Celexa (R. 274).³ Dr. Majeroni switched his medication to Wellbutrin. She noted that his depression was "improving" (R. 275). She recommended that he see a psychiatrist (R. 275). On March 29, 2005, Catanzaro saw Dr. Won Hoon Park, at Horizons Health Center ("Horizons"), for his depression (R. 304-05). The plaintiff reported that he was unemployed, but was helping his brother deliver auto parts (R. 305). Based on her initial evaluation, Dr. Park diagnosed depression (R. 305). During a July 18, 2005, follow-up, Dr. Majeroni stated that plaintiff reported working as a musician "all night" (R. 272).

On November 3, 2005, plaintiff's mother called ECMC, and asked for a medical note, stating that plaintiff could not work because of his limitations (R. 266). On the telephone message form, someone, whose handwriting looked like Dr. Majeroni's, replied "What Limiations? Will discuss at visit" (R. 266). In the same handwriting, it was also noted that plaintiff's asthma was treatable, and "if he wants psychiatric disability, he needs to see a psychiatrist" (R. 266).

---

³ The date by the signature (R. 275), March 14, 200**4**, appears to be a mistake in light of the context of the findings in the report; the date March 14, 200**5**, at the top right of the page is more likely the correct date (R. 274-275).

The plaintiff saw Dr. Majeroni again on November 14, 2005(R. 264-65). He reported that he was behind on child support payments, and wanted something for the family court saying that he could not work (R. 264). Dr. Majeroni noted that plaintiff's asthma was controlled with medication (R. 265). She believed his complaints of lack of energy and motivation may be due to depression, and stated that she had been "telling him for months that he needed to be under the care of a psychiatrist for this" and that she could not "give him a psychiatric disability." (R. 265).

On November 29, 2005, plaintiff returned to Horizons for his depression (R. 282-302). On examination, he was oriented to person, place, and time (R. 301). His memory was good; and his ability to concentrate, insight, and judgment were fair (R. 301). In the subsequent months he missed numerous appointments (R. 307, 308, 309, 310, 316, 330, 331).

In response to a request by the ALJ for additional information (R. 246), on October 18, 2006, Dr. Majeroni reported that she had treated the plaintiff for asthma (R. 247; see generally R. 261-62, 264-68, 272-75). Dr. Majeroni stated that his asthma required no hospitalizations, and that he had one exacerbation, which had required oral prednisone (R. 248). Dr. Majeroni opined that Catanzaro could frequently lift and/or carry twenty pounds and occasionally fifty pounds (R. 254). She assessed that, in an eight-hour workday, the plaintiff could sit for eight hours in total; stand for two hours at a time, for a total of four hours; and walk for four hours at a time, for a total of six hours (R. 255). She opined that he should never be around dust, odors, fumes, pulmonary irritants, and extreme cold (R. 258). She also noted that the plaintiff could engage in activities, such as shopping, preparing simple meals, and using public transportation (R. 259).

On October 30, 2006, Dr. Majeroni, opined that Catanzaro's ability to understand, remember, and carry out instructions were not affected by his impairment (R. 251). She further stated that he was not affected in his ability to interact appropriately with supervisors, coworkers, and the public; and to respond to changes in a work setting (R. 252). Dr. Majeroni reiterated that the plaintiff was receiving treatment for depression at Horizon, and that doctors at that facility would be better able to answer questions about his mental functioning (R. 252).

On February 5, 2007, Dr. Park, the plaintiff's psychiatrist, and Carissa Angelo-Stoffer, his therapist, stated that the plaintiff had a marked restriction in daily activities, but no limitation in his ability to relate to others (R. 322). They indicated that it was "unknown" whether Catanzaro would be able to do his usual work and that they would assess him in six to nine months (R. 322). On April 24, 2007, Angelo-Stoffer, stated that the plaintiff reported that his symptoms began since his break-up with his daughter's mother; that he has been unable to work and function as he had prior to his depression; and that his only happiness came from spending time with his daughter (R. 327). In a report dated May 1, 2007, Dr. Park stated that since the breakup of the plaintiff's relationship, he reported that he was unable to work or function as he had in the past (R. 326).

## **DISCUSSION**

The only issue to be determined by this Court is whether the ALJ's decision that the plaintiff was not under a disability is supported by substantial evidence. See 42 U.S.C. § 405(g); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991). Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as

7

adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. National Labor Relations Bd., 305 U.S. 197, 229 (1938)).

For purposes of both Social Security Insurance and disability insurance benefits, a person is disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B).

The plaintiff bears the initial burden of showing that his impairment prevents him from returning to her previous type of employment. Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the national economy and which the plaintiff could perform." Id.; see also Dumas v. Schweiker, 712 F.2d 1545, 1551 (2d Cir. 1983); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).

In order to determine whether the plaintiff is suffering from a disability, the ALJ must employ a five-step inquiry:

> (1) whether the plaintiff is currently working;
>
> (2) whether the plaintiff suffers from a severe impairment;

> (3) whether the impairment is listed in Appendix 1 of the relevant regulations;
>
> (4) whether the impairment prevents the plaintiff from continuing his past relevant work; and
>
> (5) whether the impairment prevents the plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520 & 416.920; Berry, supra, 675 F.2d at 467. If a plaintiff is found to be either disabled or not disabled at any step in this sequential inquiry, the ALJ's review ends. 20 C.F.R. §§ 404.1520(a) & 416.920(a); Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992). However, it should be noted that the ALJ has an affirmative duty to fully develop the record. Gold v. Secretary, 463 F.2d 38, 43 (2d Cir. 1972).

In order to determine whether an admitted impairment prevents a claimant from performing his past work, the ALJ is required to review the plaintiff's residual functional capacity and the physical and mental demands of the work he has done in the past. 20 C.F.R. §§ 404.1520(e) & 416.920(e). When the plaintiff's impairment is a mental one, special "care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g. speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work." See Social Security Ruling 82-62 (1982); Washington v. Shalala, 37 F.3d 1437, 1442 (10th Cir. 1994). The ALJ must then determine the individual's ability to return to his past relevant work given his residual functional capacity. Washington, supra, 37 F.3d at 1442.

In the instant case, the ALJ determined that Catanzaro is not currently engaged in substantial gainful activity (R. 17); that he suffers from severe impairments including moderately severe obstructive lung disease, restrictive airways disease (asthma), perennial allergic rhinitis, adjustment disorder with mixed anxiety and depressed mood, and depressive disorder. (R. 17). Further, the ALJ determined that these impairments cause significant limitations in the plaintiff's ability to perform basic work activities. (R. 17). The ALJ found that these impairments do not meet or equal the criteria set forth in the Appendix I listings. (R. 18). The ALJ then found that Catanzaro retained the residual functional capacity to lift, carry and push up to 50 pounds occasionally, and 25 pounds frequently; that he could sit for two hours at a time and up to eight hours in an eight hour work day with normal breaks; that he could stand for two hours at a time and up to four hours in an eight hour work day with normal breaks; that he could walk for two hours at a time and up to four hours in an eight hour work day with normal breaks; that he should avoid even moderate exposure to dust, fumes, oders, chemicals, gases, and extreme cold. The ALJ also determined that Catanzaro is able to maintain attention, and concentration for adequate periods to understand, remember and carry out job instructions for simple and detailed unskilled work tasks, make adequate decisions, related appropriately with others generally respond appropriately to typical work stress, and adapt to changes in the work setting. (R. 26). Given this residual functional capacity, the ALJ determined that Catanzaro retained the ability to perform work that exists in significant numbers in the national economy. (R. 30). In this regard, the ALJ relied upon the testimony of a vocational expert who stated that in light of the residual functional capacity and limitations of the plaintiff, the plaintiff could still perform the requirements of the following occupations: Food Service Worker (DOT 319.677-

014); Packaging Machine Tender (DOT 920.685-078); Kitchen Porter (DOT 318.687-010); Cannery Worker (DOT 529.686-014); and Fast-Foods Worker (DOT 311.471-010). (R. 30-31).

**Failure to Recontact the Plaintiff's Treating Physicians**

The plaintiff contends that the ALJ failed to recontact Dr. Majeroni and Dr. Park to obtain additional information needed to properly determine his claim for benefits. The plaintiff asserts that the ALJ should have recontacted Dr. Majeroni relating to Catanzaro's ability to be exposed to dust, odors, fumes, pulmonary irritants and extreme cold temperatures. The plaintiff argues that it was necessary to recontact Dr. Majeroni on this issue because the ALJ rejected (R. 29) Dr. Majeroni's opinion that Catanzaro should "never" be exposed to those elements. (R. 258). Further, the plaintiff contends that the ALJ was required to recontact Dr. Park with respect to the limitations due to Catanzaro's depression and other mental impairments.

Section 416.912(e) of the Code of Federal Regulations ("C.F.R.") provides, in relevant part:

> (e) Recontacting medical sources. ***When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision.*** To obtain the information, we will take the following actions.
>
> (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. ***We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on***

> *medically acceptable clinical and laboratory diagnostic techniques.* We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source. In every instance where medical evidence is obtained over the telephone, the telephone report will be sent to the source for review, signature and return.
>
> (2) We may not seek additional evidence or clarification from a medical source when we know from past experience that the source either cannot or will not provide the necessary findings.

20 C.F.R. SS416.912(e)(emphasis added). "The lack of specific clinical findings in the treating physician's report [does] not, standing by itself, justify the ALJ's failure to credit the physician's opinion." Clark v. Comm'r of Soc. Sec., 143 F.3d at 118. The ALJ has an "affirmative duty to develop the record and seek additional information from the treating physician, *sua sponte,* even if plaintiff is represented by counsel" to determine upon what information the treating source was basing his opinions. Colegrove v. Comm'r of Soc. Sec., 399 F.Supp.2d 185, 196 (W.D.N.Y.2005). Failure to re-contact is error. Taylor v. Astrue, 2008 WL 2437770 at *3 (E.D.N.Y. 2008)(finding it error for the ALJ to not re-contact treating physician when he determined that the physician's opinion was "not wellsupported by objective medical evidence"); Peed v. Sullivan, 778 F.Supp. 1241, 1246 (E.D.N.Y.1991) (noting that an ALJ must "make every reasonable effort to obtain ... a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability"); see also Clancy v. Astrue, 2009 WL 1457690 at *6 (N.D.N.Y.,2009); Colley v. Astrue, 2009 WL 1392535 at *9 (N.D.N.Y.,2009). However, the ALJ does not have a duty to re-contact a treating physician in the event he submits a report inconsistent with other medical evidence, if the evidence the treating

source submits as a whole, is complete. *See* Harvey v. Astrue, 2008 WL 4517809 at *9 (N.D.N.Y. 2008); Spruill v. Astrue, 2008 WL 4949326 at *4 (S.D.N.Y. 2008).

The record reflects that the ALJ contacted and received some documentation from Mr. Majeroni in November 2004. (R. 105). The ALJ then recontacted Dr. Majeroni on October 16, 2006 (R. 117). In response to this contact, Dr. Majeroni submitted the residual functional capacity evaluation completely precluding Catanzaro's exposure to elements like dust, odors, fumes and cold temperatures. (R. 258; Docket No. 13 at page 2). In the ALJ's opinion, this newly obtained information conflicted with evidence that Catanzaro "only uses his Albuteraol once every two weeks" and that at the hearing, the plaintiff stated that he used "his Albuterol every other day." (R 29) Based upon this inconsistency, rather than attempt to seek clarification from Dr. Majeroni, the ALJ expressly rejected Dr. Majeroni's opinion. (Id.)

The ALJ similarly failed to develop the record relating to Dr. Park's assessment of the plaintiff's limitations due to his depression and mental impairments. On February 8, 2007, Dr. Park partially completed a residual functional capacity evaluation. In this evaluation, Dr. Park responded that it was "unknown" whether Catanzaro would "be able to do usual work" and that he would "assess [Catanzaro] in 6-9 months." It does not appear that the ALJ made any further attempt to contact Dr. Park about this assessment[4] Although the record contains a short note from Dr. Park dated May 1, 2007 (in which Dr. Park states that Catanzaro "reports he has been unable

---

[4] The defendant does not contend that the ALJ recontacted Dr. Park directly, but does suggest that the ALJ followed-up with Horizon's Health Services, the facility with which Dr. Park was affiliated. (Docket No. 13 at page 2, citing R 106). However, the Disability Worksheet to which the defendant cites contains no reference suggesting that the ALJ contacted Dr. Park or Horizons subsequent to Dr. Park's February 2007 partial residual functional capacity assessment. (R 105-107).

to work or function as he normally had prior to his depression"), as well as a short note from Carissa Angelo-Stoffer, a Licensed Clinical Social Worker ("LCSW"), dated April 24, 2007 (in which Angelo-Stoffer states that Catanzaro "has been unable to work or function as he normally had prior to his depression."). These brief notes do not constitute the residual functional capacity assessment which Dr. Park's February 8, 2007 report indicated would be performed sometime between August and November of 2007. (R 322). Although the ALJ did not issue his decision in this case until November 2, 2007 (R. 31), the ALJ made no attempt to obtain the residual functional capacity evaluation from Dr. Park. The defendant argues that it was not necessary to recontact Dr. Park because his statement was "far from vague." (Docket No. 13 at page 3). The defendant contends that: Dr. Park merely reiterated what plaintiff had reported to him. Otherwise, the doctor would have said 'Thomas is unable to work,' rather than 'Thomas reports that he has been unable to work.'" (Docket No. 13 at page 3). The defendant's conjecture as to what Dr. Park "would have said" is speculation at best. Dr. Park's statement is not inconsistent with his prior statement that he would assess Catanzaro's ability to work in 6 to 9 months. The record in this case was not complete. Further, the Court is not persuaded by the defendant's argument that the ALJ did not need to recontact Dr. Park, and that he properly relied upon the opinion of Dr. Majeroni and Dr. Thomas Ryan, a consulting psychiatrist. (Docket No. 13 at page 3). Initially, it must be noted that the record reflects that Dr. Majeroni repeatedly declined to offer an opinion as to Catanzaro's limitations relating to his mental impairments. Dr. Ryan's opinion, is not consistent with the statements issued by Dr. Park and LCSW Angelo-Stoffer. Although Dr. Park's statement is worded in such a way that it could be interpreted as being merely a repetition of the plaintiff's complaints; LCSW Angelo-Stoffer's statement is not worded in such a fashion.

14

Moreover, Dr. Ryan's opinion was issued in December of 2004 – almost ***two years prior*** to the statements of Dr. Park and LCSW Angelo-Stoffer, and ***almost three years prior*** to the ALJ's decision. See Griffith v. Astrue, 2009 WL 909630 at *9 (W.D.N.Y.,2009)(The State Agency Officials' reports, which are conclusory, stale, and based on an incomplete medical record, are not substantial evidence). Thus, the ALJ's reliance upon the statement of Dr. Ryan does not constitute substantial evidence based upon the whole record in this matter.

Based on the above, the ALJ failed to adequately develop the record prior to issuing his decision in the case.

**Failure to Properly Assess Opinion of Treating Physicians**

The plaintiff claims that the ALJ failed to properly assess the opinions of the plaintiff's treating physicians, including Dr. Majeroni, Dr. Park and LCSW Angelo-Stoffer.

Under the "treating physician" rule, "the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." Shaw v. Chater, 221 F.3d 126, 134 (2d Cir.2000); *see also* 20 C.F.R. § 404.1527(d)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). The deference accorded to a treating physician's opinion may, however, be reduced upon consideration of other factors, including the length and nature of the treating doctor's relationship with the patient, the extent to which the medical evidence supports the doctor's opinion, whether the doctor is a

specialist, the consistency of the opinion with the rest of the medical record, and any other factors "which tend to support or contradict the opinion." 20 C.F.R. § 404.1527(d)(2)(i)-(ii) and (d)(3)-(6). See also Michels v. Astrue, 2008 WL 4748653 at *1 (2d Cir. 2008).

Although the ALJ failed to credit Dr. Majeroni's opinion that the plaintiff should never be exposed to dust, odors, fumes and cold temperatures, it is not clear, based upon the record before the Court, that acceptance of such a finding would require a determination that the plaintiff is entitled to disability benefits under the Act. Moreover, as noted above, the ALJ failed to adequately develop the record relating to this issue. Similarly, the statements by Dr. Park and LCSW Angelo-Stoffer[5] do not establish that the plaintiff is entitled to disability benefits under the Act. Both statements indicate that Catanzaro "is unable to work or function as he normally had prior to his depression." Again, as noted above, these statements are not an adequate residual functional capacity assessment and the ALJ should have recontacted these medical sources for clarification and to obtain such an assessment. However, it does not necessarily follow that Catanzaro's inability to "work or function as he normally had prior to his depression" constitutes an inability to perform substantial gainful activity under the Act.

---

[5] The treating physician rule does not extend to the opinions of non-physician medical sources such as physician's assistants, nurse practitioners and LCSWs. Although the ALJ must consider the opinions of such professionals who provide treatment to claimants pursuant to Social Security Ruling 06-3p ("SSR 06-3p"), the ALJ is not *required* to give controlling weight to such opinions under the treating physician doctrine. Genier v. Astrue, 2008 WL 4820509 at *3 (2d Cir. 2008)( A physician's assistant and a nurse practitioner do not constitute 'acceptable medical sources' under the treating physician rule pursuant to Social Security Ruling 06-3p (SSR 06-3p)(effective date August 9, 2006), and therefore, their assessments do not warrant the same deference as a physician's opinion.").

### Substituting ALJ Opinion for Medical Expert Opinion

Neither the trial judge nor the ALJ is permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion. *See* Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir.1998); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000). In rejecting Dr. Majeroni's opinion that Catanzaro should never be exposed to dust, odors, fumes and cold temperatures, the ALJ substituted his own opinion on this issue based upon the frequency of the plaintiff's usage of Albuterol. The ALJ is not qualified to make medical findings regarding the frequency with which the plaintiff must use a certain medication to substantiate a finding made by a treating physician. To the extent that the ALJ's decision is based upon the substitution of his opinion for that of a treating physician, the ALJ erred and the administrative decision must be vacated.

### Remand Warranted

Upon review of a decision by the Commissioner, a district court may affirm, modify, or reverse the Commissioner's decision with or without remand to the Commissioner for a rehearing. *See* 42 U.S.C. § 405(g). A reversal and remand solely for the calculation of benefits is appropriate when the administrative record has been fully developed and the only reasonable conclusion that could be drawn is that the claimant is disabled within the meaning of the Social Security Act. *See* Podedworney v. Harris, 745 F.2d 210, 224 (3d Cir.1984). ("A reversal, as opposed to a remand, is in order only where a fully developed administrative demonstrates that the claimant is clearly entitled to benefits, and thus a new administrative hearing would serve no useful purpose.") *See also* Campbell v. Shalala, 988 F.2d 741, 744 (7th Cir.1993); Micus v. Bowen, 979 F.2d 602, 609 (7th Cir. 1992).

The plaintiff contends that his daily activities are not inconsistent with a finding that he is disabled; that the ALJ erred in evaluating the severity of the plaintiff's mental impairment; that the ALJ improperly ignored lay evidence (principally, the testimony of Catanzaro's mother); and that the ALJ failed to demonstrate that there is other work in the national economy which Catanzaro can perform. In this matter, the record considered as a whole does not mandate a reversal of the Commissioner's decision. Further findings are required, particularly the ALJ's development of the record relating to Catanzaro's ability to be exposed to dust, odors, fumes and cold temperatures, and an adequate residual functional capacity assessment considering the plaintiff's mental impairments. Butts v. Barnhart, 388 F.3d 377, 385 (2nd Cir.2005). ("In deciding whether a remand is the proper, we have stated that where the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate."); Rosa v. Callahan, 168 F.3d 72, 83 (2nd Cir.1999). ("This case, in our view, is one in which remand for further development of the evidence is the wiser course.").

## CONCLUSION

For the foregoing reasons, this Court recommends that the decision of the Commissioner be vacated and this matter be REMANDED for further administrative proceedings.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy to the Report & Recommendation to all parties.

**Any objections to this Report & Recommendation *must* be filed with the Clerk of this Court *within ten (10) days* after receipt of a copy of this Report & Recommendation in**

**accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) and W.D.N.Y. Local Civil Rule 72.3(a). Failure to file objections to this report & recommendation within the specified time or to request an extension of such time waives the right to appeal any subsequent district court's order adopting the recommendations contained herein.** Thomas v. Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The District Court on *de novo* review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.**

So Ordered.

                                                         */s/ Hugh B. Scott*
                                                United States Magistrate Judge
                                                Western District of New York

Buffalo, New York
June 30, 2009